FILED IN OPEN COURT
U.S.D.C. Atlanta

FEB ⌐9 2021

James N. Hatten, Clerk
By:
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

*v.*

SEBASTIAN TOMASZEWSKI,


BLUE SKY AEROSPACE, LLC,

Criminal Indictment

No.    1 21 - CR - 055

**UNDER SEAL**

THE GRAND JURY CHARGES THAT:

**Count One**
**(Conspiracy to Interfere with Government Functions)**

**The Conspiracy**

1. Beginning in or about June 2015, and continuing through in or about

October 2017, in the Northern District of Georgia and elsewhere, the Defendants,

SEBASTIAN TOMASZEWSKI,


BLUE SKY AEROSPACE, LLC,

did knowingly and willfully combine, conspire, confederate and agree together, with one another, and with others known and unknown to the Grand Jury, to commit the following offenses against the United States:

A.  To knowingly and willfully export, and cause to be exported, from the United States, and trans-shipped to the Republic of Iran through Turkey, U.S. origin aircraft parts without first having obtained a license or other written authorization for such export, in violation of the International Emergency Economic Powers Act, Title 50, United States Code, Section 1705, and Title 31, Code of Federal Regulations, Sections 560.203(a), 560.204, 560.205, and 560.206; and

B.  To fraudulently and knowingly export and send from the United States merchandise, articles and objects contrary to any law and regulation of the United States, specifically, Title 13, United States Code, Section 305, all in violation of Title 18, United States Code, Section 554(a).

### Introductory Allegations

At all times relevant to this Indictment:

### I. The Defendants

2.                                      was a company organized and operating in the                          that at times used a business address located in Turkey.  In or about June 2015,        leased Boeing 757-200 (MSN      ) and Boeing 737-400 (MSN      ) aircrafts (the "Boeing Aircrafts") to a commercial airline operating in the Republic of Iran (the "Iranian Airline").

[          ] also agreed with the Iranian Airline to provide technical maintenance and aircraft equipment ("Aircraft Parts") for the Boeing Aircrafts.

3. In or about June 2016, the Iranian Airline purchased the Boeing Aircrafts. [          ] thereafter continued to provide Aircraft Parts to the Iranian Airline.

4. [                              ] was the General Director for [          ].

5. [                              ] was the Director of Maintenance and Engineering at [          ].

6. BLUE SKY AEROSPACE, LLC ("BLUE SKY"), was a United States company operating in Boca Raton, FL, that sold aircraft parts.

7. SEBASTIAN TOMASZEWSKI ("TOMASZEWSKI"), a United States citizen, was the owner and General Manager of BLUE SKY.

8. [                              ] a company organized and operating in Turkey, provided logistical support in coordination with [                              ] for Aircraft Parts that were shipped from the United States and delivered to the Republic of Iran.

9. [                              ] a company organized and operating in Turkey, was a freight forwarding company that received Aircraft Parts shipped from BLUE SKY and delivered, or caused to be delivered, Aircraft Parts to the Republic of Iran.

10. [                              ] was the owner of [          ] and the General Manager of [          ].

3

## II. The International Emergency Economic Powers Act

11. Through the International Emergency Economic Powers Act ("IEEPA"), the President of the United States was granted the authority to address unusual and extraordinary threats to the national security, foreign policy or economy of the United States pursuant to Title 50, United States Code, Section 1701(a) ("Section 1705").  Under that authority, the President and the Executive Branch issue orders and regulations governing and prohibiting certain activities and transactions with Iran by persons and involving items of U.S. origin or exported from the United States.

12. Under IEEPA, it was a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of, any license, order, regulation or prohibition issued pursuant to Section 1705(a).  Pursuant to Section 1705(c), any person who willfully committed, attempted to commit, conspired to commit, or aided and abetted in the commission of, any unlawful act as described in subsection (a) of the statute was guilty of a crime.

13. In or about 1995, and again in or about 1997, the President issued a series of Executive Orders regulating transactions with Iran pursuant to his authorities under IEEPA. *See* Executive Orders 13059 (August 19, 1997), 12959 (May 6, 1995) and 12957 (March 15, 1995). Since 1997, each President has continued the national emergency with respect to Iran and those Executive Orders.  In March 2020, the President stated that the "actions and policies of the Government of Iran – including its proliferation and development of missiles and other asymmetric and conventional weapons capabilities, its network and campaign of regional

4

aggression, its support for terrorist groups, and the malign activities of the Islamic Revolutionary Guard Corps and its surrogates – continue to pose an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." So "the national emergency declared on March 15, 1995, must continue in effect beyond March 15, 2020." 85 Fed. Reg. 14731 (March 12, 2020).

### III.  The Iranian Transactions and Sanctions Regulations

14. The U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") issued the Iranian Transactions and Sanctions Regulations ("ITSR"). 31 C.F.R. Part 560.  The ITSR prohibited the following transactions unless conducted pursuant to a license or other authorization issued by OFAC:

A.  The exportation, re-exportation, sale or supply, directly or indirectly, from the United States, or by a U.S. person, wherever located, of any goods, technology or services to Iran and the Government of Iran, including the exportation, re-exportation, sale or supply of any goods, technology or services, to a person in a third country undertaken with knowledge or reason to know that such goods technology or services were intended specifically for supply, transshipment or re-exportation, directly or indirectly, to Iran or the Government of Iran (31 C.F.R. § 560.204);

B.  The re-exportation from a third country, directly or indirectly, by a person other than a United States person, of any goods, technology, or services that have been exported from the United States if undertaken with knowledge or reason to know that the re-exportation is intended specifically for Iran and the

5

exportation of such goods, technology, or services from the United States to Iran was subject to export license application requirements under any United States regulations (31 C.F.R. § 560.205);

C.  Any transaction, or dealing in or related to, by a U.S. person, wherever located, involving goods, technology or services for exportation, re-exportation, sale or supply, directly or indirectly, to Iran or the Government of Iran (31 C.F.R. § 560.206); and

D.  Any transaction that evaded or avoided, had the purpose of evading or avoiding, caused a violation of, or attempted to violate any of the prohibitions in the ITSR (31 C.F.R. § 560.203(a)).

15. With respect to the prohibitions on certain transactions as listed in Section 560.206(a), the ITSR states that the term "transaction or dealing" includes but is not limited to purchasing, selling, transporting, swapping, brokering, approving, financing, facilitating, or guaranteeing. 50 U.S.C. § 560.206(b).

### The Manner and Means

16. The Defendants and their co-conspirators, known and unknown to the Grand Jury, used the following manner and means, among others, to accomplish the objects of the conspiracy:

A.  BLUE SKY agreed to provide and supply U.S. origin Aircraft Parts to _____ that _____ had selected and purchased. _____ would negotiate with U.S. suppliers for the purchase of Aircraft Parts and caused the delivery of Aircraft Parts to BLUE SKY in the United States and the payment by BLUE SKY of certain items.

6

B. TOMASZESKI and [          ] would submit, and caused to be submitted, to U.S. vendors certain forms agreeing to comply with U.S. export control laws wherein they affirmatively, and falsely, represented that they would not divert shipments to Iran, all the while knowing that the Aircraft Parts were to be delivered to the Republic of Iran. TOMASZESKI and [          ] also submitted, and caused to be submitted, certain statements of end-use of the Aircraft Parts wherein they intentionally failed to list the Iranian Airlines as the actual end-user of the Aircraft Parts being shipped from the United States.

C. [      ] would instruct BLUE SKY to ship the Aircraft Parts from the United States to [          ] to conceal the fact that the Republic of Iran was the intended destination.

D. [      ] would contact [          ] to provide advance notice regarding shipments from BLUE SKY to [          ]. [          ] [      ] would thereafter ship, and caused to be shipped, the Aircraft Parts to the Iranian Airline that had been delivered to Turkey by BLUE SKY.

E. At no time did any of the Defendants ever apply for, or receive, a license or other written authorization from OFAC that authorized any export, directly and indirectly, from the United States to the Republic of Iran.

## Overt Acts

17. In furtherance of the conspiracy and to effect its objects, the Defendants, together with others known and unknown to the Grand Jury, committed and caused to be committed, at least one of the following Overt Acts, among others:

7

*Aircraft Tires*

A. On or about June 2, 2015, _____ signed a contract on behalf of _____ for the lease of one of the Boeing Aircrafts to the Iranian Airline.

B. On or about June 17, 2015, _____ requested price quotes from BLUE SKY for the purchase of Aircraft Parts and asked TOMASZEWSKI to "work out the way to deliver [them] to Iran."

C. On or about June 28, 2015, _____ told TOMASZEWSKI that there was a delay in "the commencement of the operation" in Iran due to political issues.

D. On or about July 9, 2015, _____ told TOMASZEWSKI that Company A did not have a license to export aircraft tires to Iran when _____ attempted to directly purchase aircraft tires. _____ asked if TOMASZEWSKI could purchase the aircraft tires and ship them to Iran.

E. On or about July 9, 2015, TOMASZEWSKI replied to _____ that the aircraft tire transaction price would increase if shipment had to be routed through the U.S.

F. On or about July 22, 2015, _____ signed a contract on behalf of _____ to purchase aircraft parts from BLUE SKY.

*Aircraft Brake (SN        )*

G. On or about July 22, 2015, _____ instructed TOMASZEWSKI to ship an aircraft brake to the Iranian Airline at the Tehran, Iran delivery address.

H. On or about July 23, 2015, TOMASZEWSKI sent a BLUE SKY invoice to _____ for the sale of an aircraft brake part bearing serial number _____

8

("Brake 3415").  The invoice listed the Iranian Airline as the recipient of the shipment with a delivery address in Tehran, and contained the following language: "These commodities, technologies or software were exported from the United States in accordance with the Export Administration Regulations."

      I. On or about July 23, 2015,             advised TOMASZEWSKI that one aircraft was in Iran and that a second aircraft would be in Iran in one week.

      J. On or about July 27, 2015,         and TOMASZEWSKI learned from a U.S. logistics company that: (i) the Brake 3415 shipment was delayed pending clearance by the U.S. government; and (ii) all shipments to an embargoed country such as Iran went through a "formalized clearance and inspection process."

      K. On or about July 28, 2015,           informed TOMASZEWSKI that the shipper would return Brake 3415 to BLUE SKY.          instructed TOMASZEWSKI to resend the Brake 3415 shipment as soon as possible to       's agent          in Turkey.

      L. On or about July 31, 2015,           advised TOMASZEWSKI that the "brake [was] finally in Iran."

### *Aircraft Brake (SN      )*

      M. On or about December 11, 2015, BLUE SKY provided         with an invoice for the purchase of an aircraft brake, bearing serial number ("BRAKE 0333").            were listed as the shipping recipient in Istanbul, Turkey. The invoice contained the following: "These

commodities, technologies or software were exported from the United States in accordance with the Export Administration Regulations."

N. On or about December 14, 2015, TOMASZEWSKI provided                    with the Air Waybill number for the shipment of Brake 0333 to Turkey.

O. On or about December 14, 2015, an          Representative provided                    with notification of the shipment of Brake 0333 to                    .

P. On or about December 17, 2015, a                    representative informed                    that Brake 0333 would be shipped to Iran on that date.  The                    representative provided a copy of the Air Waybill that listed: (i) the shipper as                    ; (ii) the consignee as the Iranian Airline; and (iii) the destination as Imam Khomeini International Airport.  The Packing List described the item shipped as "one brake assy – B737, serial number        ."

Q. On or about December 31, 2015,                    provided BLUE SKY with payment confirmation for the purchase of Brake 0333.

### *Aircraft Brake (SN     )*

R. On or about January 28, 2016,          sent TOMASZEWSKI a purchase order that requested the purchase of a specific type of aircraft brake that was priced at $13,250.  The purchase order included an instruction that BLUE SKY ship the part to                    .

S. On or about January 28, 2016, BLUE SKY sent                    an invoice for the sale of an aircraft brake bearing serial number          ("Brake 2629").                    were listed on the invoice as the recipients in

10

Istanbul, Turkey.  The invoice contained the following: "These commodities, technologies or software were exported from the United States in accordance with the Export Administration Regulations. Diversion contrary to U.S. law is prohibited."

T.  On or about January 28, 2016, an _____ representative provided _____ a copy of the BLUE SKY invoice and asked if _____ could ship Brake 2629 to Mashad, Iran, using the Iranian Airline.

U. On or about January 31, 2016, Brake 2629 was shipped and exported from Atlanta, Georgia, to Turkey.

V. On or about February 8, 2016, _____ signed on behalf of _____ an Export Compliance/End User Certification for a separate company that stated, in part, that _____ would not "export or re-export U.S. products, technology or software to Cuba, Iran, North Korea, Syria or Sudan – or to any restricted country unless otherwise authorized by the United States Government."

W. On or about February 15, 2016, _____ sent payment confirmation to BLUE SKY for the Brake 2629 purchase transaction.

X. On or about February 27, 2016, _____ sent an air waybill to _____ indicating that _____ had shipped Brake 2629 to the Iranian Airline with Imam Khomeini International Airport listed as the destination. _____ included a copy of the packing list that described the shipped item as "one brake assy – B737, serial number _____."

Y. On or about April 29, 2016,                    signed an Export Compliance Certification on behalf of        that stated, in part, that        would not "export or re-export any [company] products, technology or software to any country on the US Debarred list, unless otherwise authorized by the United States Government" and that it would "abide by all applicable U.S. Export control laws and regulations . . . and [would] obtain any licenses or approvals required by the U.S. Government prior to export or re-export of [the company's] products, software or technology."

### Attempted Purchase of an Aircraft Starter

Z. On or about May 26, 2016,                 contacted Company B, an Illinois corporation, to ask about the availability and cost of a B757-200 starter component (the "Aircraft Starter"). Company B replied that the Aircraft Starter was in inventory and provided a price quote.  Company B indicated that                        would be required to submit both a customer activation form and an export compliance form to purchase the Aircraft Starter.

AA. On or about May 26, 2016,                 sent an export compliance form to Company B stating        "will not export or re-export U.S. products, technology or software to Cuba, Iran, North Korea, Syria or Sudan – or to any restricted country unless otherwise authorized by the United States Government."

BB. On or about May 26, 2016,                 told TOMASZEWKI that                 had identified a U.S. equipment part for which he would charge                 $38,000 for the purchase so that he and TOMASZEWSKI could divide the

12

profit.  TOMASZEWSKI then agreed to wire payment for the item to Company B.

CC. On or about May 26, 2016, TOMASZEWSKI sent an email to Company B that contained a confirmation of a wire transfer payment of $32,000 to Company B.  The email also contained an "Export Compliance/End User Certification/Letter of Understanding" signed by TOMASZEWSKI.  In this document, BLUE SKY stated that it "will not export or re-export U.S. products, technology or software to Cuba, Iran, North Korea, Syria or Sudan – or to any restricted country unless otherwise authorized by the United States Government."

DD. On or about May 26, 2016, TOMASZEWSKI provided Company B with a form from BLUE SKY listing ____ as the ultimate end-user of the Aircraft part and the end-use location as Istanbul, Turkey.

EE. On or about May 26, 2016, TOMASZEWSKI informed ____ that Company B suspected that ____ was associated with Iran based upon research of information that ____ had provided.  TOMASZEWSKI advised that Company B was refusing to release the Aircraft Starter.  TOMASZEWSKI instructed ____ to always respond that the Aircraft Starter was for BLUE SKY and that the end-user customer was located in France.  TOMASZEWSKI stated that he would make another attempt to get Company B to release the item.

FF. On or about May 26, 2016, TOMASZEWSKI told ____ that Company B was not going to release the Aircraft Starter to ____ because of its association with Iran.  TOMASZEWSKI stated that he was now representing to

13

Company B that: (i) the Aircraft Starter was to be used by a Tajik Air 757; and (ii) _____ who worked only as a consultant for _____. TOMASZEWSKI said that he had assured Company B that Tajik Air had no connection to Iran and urged Company B to release the item to _____. TOMASZEWSKI told _____ to tell Company B that the Aircraft Starter was for _____ and that he worked for BLUE SKY.

GG. On or about May 27, 2016, TOMASZEWSKI informed _____ that the deal was a "no go." TOMASZEWSKI explained that there were too many "stories" being provided to Company B and instructed _____ to copy TOMASZEWSKI on all email communications.

### Attempted Shipment of Aircraft Engine (MSN _____)

HH. On or about September 1, 2016, _____ received a proposed lease agreement for two CFM56-3C engines, including an engine bearing serial number _____ ("Engine 857203") from a United States supplier, Company C. Company C was listed as the Lessor and _____ as the Lessee of Engine 857203.

II. On or about September 1, 2016, _____ forwarded an unsigned copy of the lease agreement for Engine 857203 to TOMASZEWSKI and asked if he could provide the deposit required to lease these two engines.  BLUE SKY AEROSPACE sent an invoice for the lease deposit for two engines to _____. This invoice included Engine 857203 as an item to be leased.

JJ. On or about September 2, 2016, _____ provided Company C with BLUE SKY AEROSPACE and TOMASZEWSKI as credit references.

KK. On or about September 9, 2016, [        ] informed [        ] [        ] that an aircraft engine was being shipped to [        ]. [        ] also provided a copy of the Air Waybill showing the shipment of Engine 857203 from the United States to [        ] in Turkey.

LL. On or about September 10, 2016, a [        ] representative told [        ] that arrangements would be made to send Engine 857203 to Imam Khomeini International Airport and asked for the name of the consignee at the Tehran airport.

MM. On or about September 14, 2016, [        ] received an email from a U.S. Customs and Border Protection Officer stating that Engine 857203 was being placed on hold pending redelivery to the United States.

NN. On or about September 19, 2016, [        ] sent to a U.S. Customs and Border Protection Officer a letter from [        ] stating that Engine 857203 was for a B737-400 bearing tail number EY753 and that [   ] would provide any documents necessary to the release the U.S. Customs hold.

OO. On or about September 20, 2016, [        ] advised a representative with the Iranian Airline about [        ]'s communications with the U.S. Customs and Border Protection Officer.

PP. On or about September 28, 2016, [        ] received an email from a Bureau of Industry and Security ("BIS") Special Agent, located in Atlanta, Georgia, asking [        ] to explain [   ]s relationship with the freight forwarder, [        ] and to identify the freight forwarder's owners and managers. [        ] replied, in part, that other freight forwarders

recommended [          ] and that [    ] did not frequently use [          ] as a freight forwarder. [          ] further stated that [          ] was the [          ] [          ] General Manager and that after the hold was placed on Engine 857203, he learned [          ] was "on a black list for US Chamber of Commerce" for some illegal transactions in the past.

QQ. On or about September 29, 2016, [          ] sent an email to [          ] in which [          ] copied the portion of the BIS Special Agent's response confirming that [          ] was on the BIS Denied Entity List. The email from the BIS Special Agent also asked whether [          ]'s company or [          ] applied for an export license.

RR. On September 29, 2016, [          ] started a separate email conversation with the subject listed as "Shipment of Engine to Tajikistan." [          ] started the email chain with an email that stated, in part:

> As we discussed over the phone, we would like to use your Services in transit clearance and forwarding of the shipment we expect from the USA that needs to go to Tajikistan. We are leasing an Engine for our B737-400 engine from [          ] [          ], USA.
>
> Please, provide the details of your company to indicate in the AWB. Also let me know how much your Services will be for customs clearance of such shipment.

SS. On September 29, 2016, [          ] replied to the email:

> Dear [     ]

As you know I am not related and not staff of _____ . Just I am a freight forwarder company in Turkey whivh [sic] will organize all freight and flight organization to Tajikistan.

Bu [sic] I can give you details of _____ below for using to you.

Attn: [] (____ is the owner of company)

Also my company detail is in my mail sign.

Please use on awb as consignee _____ details.

Best regards,

TT. On or about September 29, 2016, _____ separately replied to the email described in paragraph qq, in which _____ stated, "I hope My [sic] last e mail and explanation will clear the situation."

UU. Additionally, on or about September 29, 2016, _____ sent an email to the BIS Special Agent in which _____ again explained that he did not know that _____ was on the BIS list and that he did not think there was a need to apply for an export license. _____ attached the email chain described in Overt Acts rr and ss. The date on the email communication between _____ , however, was changed from September 29, 2016, to

17

September 6, 2016. [ ]'s response in the email chain was also changed to the following:

> Dear [ ]
>
> Just I am a freight forwarder company in Turkey which that can organize freight and flight organization to Tajikistan.
>
> But I can give you details of [ ] as below for using in AWB.
>
> Please use on awb as consignee [ ] details ATTN: [] ( [ ] is owner of company)
>
> Best regards,

VV. On or about October 1, 2016, [ ] forwarded to the Iranian Airline representative the email chain between [ ] and the BIS Special Agent showing [ ]'s continued efforts to remove the hold on Engine 857203.

WW. After Engine 857203 was returned on or about October 7, 2016, to Atlanta, Georgia, from Turkey, on or about October 11, 2016, [ ] sent an email to the BIS Special Agent requesting that the engine be shipped to Tajikistan using a different freight forwarder. [ ] further stated that [ ] was the end-user.

**Additional Aircraft Parts Acquisitions/Payments**

XX. On or about January 26, 2017, BLUE SKY shipped an aircraft brake bearing serial number _____ to _____ in Istanbul Turkey.

YY. On or about February 28, 2017, BLUE SKY shipped an aircraft brake bearing serial number _____ to _____ in Turkey.

ZZ. On or about May 11, 2017, BLUE SKY sent a Pro Forma Invoice (C21 ____ ) to _____ for the purchase of various aircrafts parts.

AAA. On or about August 7, 2017, BLUE SKY sent to _____ a Purchase Order for a Fan Assembly.

BBB. On or about September 25, 2017, TOMASZEWKI sent a Pro Forma Invoice (C22 ____ ) to _____ for the purchase of various aircrafts parts.

CCC. On or about October 16, 2017, TOMASZEWSKI confirmed receipt of $25,254.37 for the payment of two invoices, C21 ____ and C22 ____ , each containing a description of aircraft parts purchased by _____ .

All in violation of Title 18, United States Code, Section 371.

## Count Two
### (International Emergency Economic Powers Act)

18. Paragraphs 2 through 17 of Count One are re-alleged and incorporated by reference herein.

19. From on or about September 1, 2016, through on or about October 30, 2016, in the Northern District of Georgia and elsewhere, the Defendants,

aided and abetted by one another, knowingly and willfully attempted to export
United States origin goods from the United States to the Islamic Republic of Iran,
that being an aircraft engine (MSN    ), without having first obtained the
required authorization from OFAC, in violation of the International Emergency
Economic Powers Act, Title 50, United States Code, Section 1705, in connection
with Title 31, Code of the Federal Regulations, Sections 560.203(a), 560.204, and
560.205; and Title 18, United States Code, Section 2.

### Forfeiture

20. Upon conviction of one or more of the offenses alleged in Counts One and
Two of this Indictment, the Defendants,                                    SEBASTIAN
TOMASZEWSKI,

BLUE SKY AEROSPACE, LLC,

shall forfeit to the United States of America, pursuant to Title 18, United States
Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any
property, real or personal, that constitutes, or is derived from, proceeds traceable
to such offenses, including, but not limited to, a personal money judgment, that
is, a sum of money in United States currency, representing the amount of
proceeds obtained as a result of the offenses alleged.

21. If, any of the property described above, as a result of any act or omission
of a Defendant:

    (a)  cannot be located upon the exercise of due diligence;

20

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

the United States intends, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

A _____ BILL

FOREPERSON

KURT R. ERSKINE
*Acting United States Attorney*

*Tracia M. King*

TRACIA M. KING
*Assistant United States Attorney*
Georgia Bar No. 421380

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181

21